## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS – EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA for the use and benefit of MIDWEST STEEL, INC.** | § § § | |
| **v.** | § § | **CASE NO. 3:19-cv-130** |
| **CLARK MCCARTHY HEALTHCARE PARTNERS II; W&W-AFCO STEEL LLC; FEDERAL INSURANCE COMPANY; TRAVELERS CASUALTY AND SURETY COMPANY; FIDELITY AND DEPOSIT COMPANY OF MARYLAND; ZURICH AMERICAN INSURANCE COMPANY; THE TRAVELERS INDEMNITY COMPANY; and LIBERTY MUTUAL INSURANCE COMPANY** | § § § § § § § § § § § § § | |

### PLAINTIFF UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF MIDWEST STEEL, INC.'S ORIGINAL COMPLAINT

Plaintiff United States of America for the use and benefit of Midwest Steel, Inc. files this Original Complaint against Defendants Clark McCarthy Healthcare Partners II, W&W-AFCO Steel LLC, Federal Insurance Company, Travelers Casualty and Surety Company, Fidelity and Deposit Company of Maryland, Zurich American Insurance Company, The Travelers Indemnity Company, and Liberty Mutual Insurance Company, and would show as follows:

### I.
### PARTIES

1.      Plaintiff United States of America for the use and benefit of Midwest Steel, Inc. ("<u>Midwest Steel</u>") is a Michigan corporation with its principal office at 2525 E. Grand Blvd., Detroit, Michigan 48211.

2.      Defendant Clark McCarthy Healthcare Partners II ("<u>CMHP</u>") is a joint venture consisting of McCarthy Building Companies, Inc., a Missouri corporation with its principal office at 1341 N Rock Hill Road, St. Louis, Missouri 63124, and Clark Construction Group, LLC, a Maryland limited liability company with its principal office at 7500 Old Georgetown Road,

7671054v1

Bethesda, Maryland 20814. CMHP's principal office is located at 200 Constitution Ave., El Paso, Texas 79936. CMHP may be served through service of process on the Texas registered agent of McCarthy Building Companies, Inc., Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3136 or wherever else the registered agent may be found. CMHP may be served through service of process on the Texas registered agent of Clark Construction Group, LLC, C T Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136 or wherever else the registered agent may be found.

3.      W&W-AFCO Steel LLC, successor in interest to Hirschfeld Steel Group, LP d/b/a Hirschfeld Industries, ("Hirschfeld")[1] is a Delaware limited liability company with its principal office at 1730 W. Reno, Oklahoma City, Oklahoma 73106. Hirschfeld may be served through its Texas registered agent, C T Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136 or wherever else the registered agent may be found.

4.      Federal Insurance Company ("FIC") is an Indiana entity whose principal office is located at 202 Halls Mill Rd, Suite B, Whitehouse Station, New Jersey 08889-3435. FIC may be served through its Texas registered agent, C T Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136 or wherever else the registered agent may be found.

5.      Travelers Casualty and Surety Company ("Travelers") is a Connecticut entity whose principal office is located at One Tower Square, Hartford, Connecticut 06183. Travelers may be served through its Texas registered agent, Corporation Service Company, at 211 East 7th Street, Suite 620, Austin, Texas 78701 or wherever else the registered agent may be found.

---

[1] W&W-AFCO Steel LLC and Hirschfeld Steel Group, LP d/b/a Hirschfeld Industries filed a certificate of merger with the Texas Secretary of State on September 18, 2018. W&W-AFCO Steel LLC was the surviving entity after the merger, which became effective on September 19, 2018.

7671054v1

6.      Fidelity and Deposit Company of Maryland ("FDC") is an Illinois entity whose principal office is located at 1299 Zurich Way, Schaumburg, Illinois 60196. FDC may be served through its Texas registered agent, Corporation Service Company, at 211 East 7th Street, Suite 620, Austin, Texas 78701 or wherever else the registered agent may be found.

7.      Zurich American Insurance Company ("Zurich") is a New York entity whose principal office is located at 1299 Zurich Way, Schaumburg, Illinois 60196. Zurich may be served through its Texas registered agent, Corporation Service Company, at 211 East 7th Street, Suite 620, Austin, Texas 78701 or wherever else the registered agent may be found.

8.      The Travelers Indemnity Company ("TIC") is a Connecticut entity whose principal office is located at One Tower Square, Hartford, Connecticut 06183. TIC may be served through its Texas registered agent, Corporation Service Company, at 211 East 7th Street, Suite 620, Austin, Texas 78701 or wherever else the registered agent may be found.

9.      Liberty Mutual Insurance Company ("Liberty Mutual") is a Massachusetts entity whose principal office is located at 175 Berkeley St, Boston, Massachusetts 02116. Liberty Mutual may be served through its Texas registered agent, Corporation Service Company, at 211 East 7th Street, Suite 620, Austin, Texas 78701 or wherever else the registered agent may be found.

## II.
## JURISDICTION AND VENUE

10.     This Court has exclusive jurisdiction over this action pursuant to the Miller Act, 40 U.S.C. § 3133 *et seq.*, which provides federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because Midwest Steel's state law claims are so related to its Miller Act claims that they form a part of the same case or controversy under Article III of the United States Constitution.

7671054v1

11.     Venue is mandatory in the El Paso Division of the Western District of Texas under 40 U.S.C. § 3133(b)(3) because the contracts at issue were performed and executed in El Paso, Texas.

12.     Venue is also mandatory in the El Paso Division of the Western District of Texas under the terms of the contracts that govern this dispute. CMHP and Hirschfeld entered into a subcontract related to the construction of the Fort Bliss Replacement Hospital in El Paso, Texas. Hirschfeld and Midwest Steel then entered into a sub-subcontract related to the project. This dispute involves claims by Midwest Steel against both Hirschfeld and CMHP. Article 14 of the sub-subcontract between Midwest Steel and Hirschfeld requires Midwest Steel to bring any claims that implicate both Hirschfeld and CMHP in accordance with the CMHP and Hirschfeld subcontract. Article 11.1 of the subcontract between CMHP and Hirschfeld states that venue for any legal action shall be the place of the project, which is El Paso, Texas.[2]

13.     Venue is also proper in the El Paso Division of the Western District of Texas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in El Paso, Texas and the construction project at issue, the Fort Bliss Replacement Hospital, is located in El Paso, Texas.

### III.
### FACTUAL BACKGROUND

14.     This case arises from the construction of the Fort Bliss Replacement Hospital in El Paso, Texas (the "Project"). The Project consists of six buildings and related smaller structures such as canopies.  The Project includes a main hospital, inpatient and outpatient clinics, an

---

[2] The referenced provision states that venue shall be in either the place of the project or the place of CMHP set forth on Page 1 of the subcontract; however, there is no place of CMHP set forth on Page 1 of the subcontract.

administrative building, a research building, a central utility plant, two access control points, and surface parking.

15.     The Project has been plagued by hundreds of design errors, design omissions, contract changes, and time delays that have put it almost three years behind schedule and added over $400 million in additional costs. The original construction cost for several contracts was $812.8 million, including $648.9 million for the construction of the main six-building hospital complex. The total cost has now ballooned to over $1.2 billion.

16.     The United States Army Corps of Engineers ("USACE" or "Owner") was the awarding contracting office for the Project.

17.     CMHP is the prime contractor to the USACE on the Project. As the prime contractor, CMHP furnished Miller Act bonds under federal law. Travelers, FDC, FIC, Zurich, and TIC (collectively, the "Miller Act Sureties") are the sureties on CMHP's Miller Act bonds.

18.     CMHP subcontracted the steel fabrication and steel erection scope of work on the Project to Hirschfeld and required Hirschfeld to supply contractual payment and performance bonds covering the subcontract (the "Hirschfeld Bonds").  Liberty Mutual is the surety on the Hirschfeld bonds.

19.     Hirschfeld subcontracted the steel erection portion of its scope of work to Midwest Steel. Midwest Steel is a beneficiary of the CMHP Miller Act Payment bonds and the Hirschfeld Liberty Mutual payment bond.

20.     USACE and its design team furnished the plans, specifications, and other design information for the Project.  CMHP contractually agreed to construct the Project in accordance with this design furnished by USACE, as did Hirschfeld and Midwest Steel for their respective portions of the Project.  Hirschfeld was contractually responsible to CMHP for both steel fabrication and erection, and Midwest Steel was contractually responsible for erecting the steel

furnished by Hirschfeld.  CMHP was responsible for paying Hirschfeld, and Hirschfeld was responsible for paying Midwest Steel.

21.    Under the *Spearin* Doctrine, USACE and its design team were responsible to the contractors, including CMHP, Hirschfeld, and Midwest Steel, for the adequacy and accuracy of the design documents.  Midwest Steel reviewed the relevant plans and specifications and submitted a bid based on those design documents, and based on a reasonable expectation of being able to progress the work in a logical and efficient manner, moving workers and equipment from building to building as the work progressed.  CMHP and Hirschfeld represented this to Midwest Steel, and Midwest Steel relied on this to its detriment in pricing its subcontract to Hirschfeld. CMHP, Hirschfeld, and Midwest Steel jointly developed a logical sequence for the work, and Midwest Steel submitted an engineered erection plan and sequence, which was accepted by Hirschfeld and CMHP.

22.    The Project was extraordinarily troubled from the start and was delayed even before Midwest Steel mobilized to the Project. There were major defects in the design, which impacted the schedule and greatly increased costs and time on the Project for all contractors, including CMHP, Hirschfeld, and Midwest Steel.  In addition to the design problems, CMHP and Hirschfeld abandoned the original schedule and planned sequence of activities, which further delayed the job, caused Midwest Steel extra time on the Project, and significantly increased Midwest Steel's costs to complete its scope of work.  Soon after the Project started, Hirschfeld stopped managing Midwest Steel and for all practical purposes abandoned its role at the Project. This forced Midwest Steel to have to interact directly with CMHP to complete its work.

23.    Midwest Steel, like the other Project participants, encountered significant delays to its work and impacts to its productivity, which extended the Project and resulted in significant additional costs. Midwest Steel's work was initially scheduled to last just over twelve months for

7671054v1

the work in the buildings, with subsequent work to be performed on the canopies extending to a total of approximately sixteen months. The original contract value was $13.374 million. Due to factors outside its responsibility or control, Midwest Steel was onsite for over fifty months through October 2017 and suffered significant losses on the project. Midwest Steel was finally able to complete its work on a third remobilization in January 2019. These additional costs associated with the extended Project costs and productivity impacts are addressed in more detail in the Preliminary Report of Findings attached as Exhibit A (the "Preliminary Report") which was prepared by the consulting firm Synergen. The Preliminary Report is incorporated by reference herein as if fully set forth herein. The Preliminary Report was furnished to all of the defendants with the Miller Act notice issued to all parties by Midwest Steel prior to the filing of this suit.

24.     Midwest Steel is entitled to recovery of additional costs expended for problems and interferences outside of its control on the Project and/or costs that resulted from the actions or inactions of others outside of Midwest Steel's control. Midwest Steel hereby submits the Preliminary Report as support for the amounts being claimed related to these issues.

25.     Because of delays caused by USACE and its Design Team, additional mismanagement of the Project by CMHP and Hirschfeld, changed sequences of work, delays in essential predecessor work, and other causes not in the control of Midwest Steel,  the base contract scope of work could not be completed by Midwest Steel until on or about January 31, 2019. Midwest Steel did complete this work.  The overall cost increases at the Project were measured in hundreds of millions of dollars for CMHP and its subcontractors.  The problems at the Project became the subject of a US Congressional inquiry and review by the Inspector General of the

Department of Defense, who issued a report as requested by Congress. Midwest Steel was not found to be at fault in this inquiry.[3]

26.     As a result of the delays, design problems, and changes, and due to other reasons, CMHP asserted claims against USACE substantially in excess of $100 million. As a part of this process, CMHP asked its subcontractors, including Hirschfeld and Midwest Steel, to furnish their claims for delay and impact damages to CMHP. Midwest Steel did so, with the assistance of Synergen, and Hirschfeld in turn adopted the claims submitted by Midwest Steel, added their mark-up, and submitted those claims to CMHP. Hirschfeld did not reject the claims submitted by Midwest Steel. Then, CMHP took all of these subcontractor claims and submitted them to USACE for compensation. Notably, CMHP did not reject Midwest Steel's and Hirschfeld's claims, but instead, submitted them to USACE.

27.     Defendants may attempt to assert that Hirschfeld issued a letter to Midwest Steel during the Project that purported to declare Midwest Steel in default for refusing to perform some extra work despite a lack of proper change order documentation and assurance of payment, but defendants waived this default. Midwest Steel was not terminated and instead, was allowed and even encouraged to continue its work on the Project and to complete it as fast as possible. The claims submitted by Midwest Steel were actually requested by CMHP and Hirschfeld as a part of CMHP's global claims to USACE, even after this alleged event of default. At all times, Midwest Steel assured CMHP and Hirschfeld that it would complete all base contract work and that it would perform all extra work that was properly documented with change orders and assurances of

---

[3] Defendants may argue that Midwest Steel contributed in part to the overall Project delays because of a fatality suffered by a Midwest Steel employee early during construction, but this delay was less than five weeks of the total delay suffered by Midwest Steel. Moreover, Midwest Steel denies that it is responsible for this five-week delay, and disputes that five weeks of delay were necessary for this circumstance.

8

payment. CMHP and Hirschfeld, though, failed to issue Midwest Steel proper change orders and assurances of payment, which are required by the subcontracts.  Therefore, if any party was in breach, it was CMHP and Hirschfeld by trying to force Midwest Steel to perform extra work without proper contract documentation and without paying for it.  In addition, Midwest Steel was not receiving other payments as required under the subcontracts, and had already suffered millions of dollars in uncompensated damages at the time that Midwest Steel was wrongfully declared in default.  Midwest Steel would have been well within its legal rights to have terminated the subcontract and walked off the job, but to its credit, stayed and finished in spite of not being paid.

28.     CMHP, after waiving this alleged event of default, negotiated with USACE to try to achieve a global settlement for what the parties called the "Legacy Claims," or "Buckets 1 through 6." CMHP elected to settle with USACE for Buckets 1 through 6, for a combined amount in excess of $140 million, which is about 75 cents on the dollar according to CMHP's lawyers.

29.     After CMHP settled the foregoing claims, it embarked on a secretive campaign to pick off the claims of each subcontractor, settling with them piecemeal, while keeping each one in the dark about what others were getting.  Significantly, the CMHP settlement with USACE was a global settlement, without specific allocations for individual subcontractors.  This allowed CMHP to settle with each subcontractor in such a way as to pocket for itself what it wanted, and pay each subcontractor pennies on the dollar.  CMHP has refused demands from Hirschfeld and Midwest Steel to produce documents that would show how the other subcontractors are being treated.

30.     Midwest Steel has not been treated fairly in this process.  CMHP and Hirschfeld each had contractual obligations to pass though Midwest Steel's claims to USACE and to assist Midwest Steel in presenting and, if necessary, litigating those claims.  Although CMHP did present Midwest Steel's claims, CMHP elected to take control and push through the above-described global settlement on its own, thereby cutting off and preventing Midwest Steel from pursuing those

claims.  Midwest Steel demanded a seat at the table, but none was given.  CMHP therefore assumed responsibility to put the interests of Midwest Steel before its own as an agent, but did not do so. Midwest Steel is not bound by any settlement CMHP made with USACE.

31.    Substantial portions of Midwest Steel's claims are not pass through claims that should have been paid by USACE. They are CMHP's responsibility. CMHP's repeated and pervasive failure to properly manage this Project also contributed to Midwest Steel's damages, as is described in more detail in the attached Preliminary Report. CMHP has never offered to pay any money to Midwest Steel for these damages.

32.    In addition, Hirschfeld owes money to Midwest Steel for extra work and Midwest Steel's damages as alleged herein, which claims are detailed in the attached Preliminary Report.

33.    None of the sureties have ever tendered any money to Midwest Steel, even though they have received notices from Midwest Steel, and all conditions precedent have occurred or been waived.

34.    Midwest Steel's claims under the Miller Act did not accrue until Hirschfeld, CMHP, and the sureties failed to make payment in full to Midwest Steel within 90 days after Midwest Steel completed its work.  Thus, Midwest Steel could not file suit until after May 2, 2019 because Midwest Steel's last day on the Project was January 31, 2019.  CMHP knew that Midwest Steel was going to file suit and took advantage of this statutory limitation to file its own suit, purporting to be an interpleader, as a preemptive strike on or about April 25, 2019. CMHP's preemptive suit is Case No. 1:19-cv-00449; *Clark McCarthy Hospital Partners II v. W&W-AFCO Steel LLC et al.*; In the United States District Court for the Western District of Texas – Austin Division. There are several issues with this suit. First, the plaintiff is wrongly identified as Clark McCarthy *Hospital* Partners II instead of the correct entity, Clark McCarthy *Healthcare* Partners II. Midwest Steel assumes this is a misnomer caused by CMHP's rush to file its preemptive action.

Moreover, CMHP intentionally filed suit in the wrong division. As was described in Paragraphs 11 and 12 herein, all claims between the parties must be litigated in the El Paso Division of the Western District of Texas. However, CMHP filed its "interpleader" action in the Austin Division. The only connection between the claims at issue and Austin is the location of CMHP's attorney's office. No witnesses, parties, or other counsel reside in Austin.  It should also be noted that there is not a complete identity of parties between these two cases, nor is there a complete identity of issues.  In addition, CMHP did not seek to interplead all of the money it received from USACE for Midwest Steel. CMHP used Midwest Steel's claims to receive additional funds from USACE, but after receiving those funds, CMHP has backtracked and is now trying to wrongfully keep millions of dollars for itself under spurious claim of offsets for the  very same extra work costs for which CMHP has admitted it received payment from USACE, offsets that are vigorously disputed by Midwest Steel. Further, CMHP wrongfully seeks in that case to enjoin Midwest Steel from filing this case. CMHP does not have clean hands to file an interpleader or seek such an injunction.

## IV.
## CAUSES OF ACTION

### A.      Count 1 – Miller Act Claims

35.     Midwest Steel repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

36.     Midwest Steel supplied materials and/or labor in prosecution of the work provided for in the prime contract. Midwest Steel has not been paid. Midwest Steel had a good faith belief that the materials and/or labor were intended for the specified work under the prime contract. Midwest Steel provided written notice to CMHP, Hirschfeld, and the Miller Act Sureties within ninety days from the date on which Midwest Steel did or performed the last of the labor or furnished or supplied the last of the material for which its claim is made. More than ninety days have elapsed since Midwest Steel last performed such work in connection with the above-

11

mentioned principal contract for which this claim is made. Midwest Steel filed suit no later than one year after the day on which the last of the labor was performed or material was supplied by Midwest Steel. Midwest Steel has complied with all rules and requirements of the Miller Act for perfecting a right of action under the Miller Act bonds. All conditions precedent to the making of this claim have been performed or have occurred.

37.     Midwest Steel has suffered damages of no less than $13,718,463.00 (including allowable markup) for which it is entitled to additional compensation, as summarized in the following chart:

| DCN # | Description | Amount ($) w/ Markup | Notes |
|---|---|---|---|
| | **Summary of Damages** | | |
| | Discrete DCNs (External) | $ 3,929,907.00 | Bucket 5A - $1,565,683 |
| | Discrete DCNs (Internal) | $ 2,197,418.00 | |
| 233 | Productivity Impacts | $ 3,569,282.36 | Bucket 6 |
| 233 | Acceleration | $ 1,005,861.34 | Bucket 6 |
| 234 | Extended Field Overhead | $ 6,082,233.54 | Bucket 6 |
| 234 | Legal/Consulting | $ 1,119,525.98 | Bucket 6 |
| | **Subtotal** | **$ 17,904,228.22** | |
| | DCN GC Adjustment | $ (1,836,195.75) | Bucket 5A GCs - ($705,752) |
| | Payment for DCNs (External) | $ (1,132,743.00) | |
| | Payment for DCNs (Internal) | $ (1,019,013.95) | |
| | Partial Payment for DCN 234 | $ (1,276,417.00) | |
| | HI Issues | $ 383,883.00 | |
| | **Subtotal** | **$ 13,023,741.52** | |
| | Balance of Base Contract Owed | $ 1,799,316.00 | |
| | Additional Legal/Consulting Charges | $ 213,380.00 | |
| | GCs for Two (2) Additional Mobilizations | $ 243,125.00 | |
| | Pay App 38 Partial Payment | $ (1,800,000.00) | |
| | Reduction in Offer for COs 27 and 28 | $ 238,900.00 | |
| | **TOTAL** | **$ 13,718,462.52** | |

38.     Midwest Steel is entitled to recover at least $13,718,463.00 in damages in connection with its Miller Act claims, plus all interest, costs, and attorneys' fees as allowed by law and Midwest Steel's contract with Hirschfeld.

### B.      Count 2 – Breach of Contract

39.      Midwest Steel repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

40.      A valid, enforceable contract exists between Midwest Steel and Hirschfeld. Midwest Steel performed, tendered performance, or was excused from performing its contractual obligations. Hirschfeld materially breached the contract by, among other things, failing to pay the outstanding amounts due and owing. Hirschfeld's material breach has proximately caused Midwest Steel to suffer damages in the amount of no less than $13,718,463.00 (including allowable markup) for which it is entitled to additional compensation, as is summarized above. Midwest Steel is entitled to recover from Hirschfeld at least $13,718,463.00 in damages, plus all interest, costs, and attorneys' fees as allowed by law and the terms of the governing contract.

### C.      Count 3 – Quantum Meruit

41.      Midwest Steel repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

42.      In addition to, or in the alternative, if such be necessary and without waiving any of the foregoing, Midwest Steel provided Hirschfeld and/or CMHP with the goods, materials, equipment, and services described herein. As a direct result of Midwest Steel providing Hirschfeld and/or CMHP with such goods, materials, equipment, and services, a benefit was conferred on Hirschfeld and/or CMHP.  Hirschfeld and/or CMHP accepted the benefit of Midwest Steel's goods, materials, equipment, and services, but has refused to pay for them.  Midwest Steel reasonably expects payment for the goods, materials, equipment, and services provided because Midwest Steel has provided similar goods, materials, equipment, and services to others in the past and has been paid for such similar goods, materials, equipment, and services. Hirschfeld and/or CMHP will be unjustly enriched in the amount claimed by Midwest Steel herein if allowed to

13

retain the benefit conferred on Hirschfeld and/or CMHP without payment for the reasonable value of the goods, materials, equipment, and services provided by Midwest Steel as described herein. As a result of Hirschfeld's nonpayment, Midwest Steel has been damaged and is entitled to recover the reasonable value of the goods, materials, equipment, and services provided to Hirschfeld.  The reasonable value of the goods, materials, equipment, and services provided to Hirschfeld for which no payment has been made is no less than $13,718,463.00 (including allowable markup) for which it is entitled to additional compensation, as is summarized above. Midwest Steel is entitled to recover at least $13,718,463.00 in damages in connection with its quantum meruit claims, plus all interest, costs, and attorneys' fees as allowed by law.

      **D.**     **Count 4 – Breach of Surety Bond – Liberty Mutual**

     43.     Midwest Steel repeats and re-alleges the foregoing allegations as if fully set forth herein.

     44.     Hirschfeld, as principal, and Liberty Mutual, as surety, are parties to Payment Bond No. 190029787 issued in relation to the Project. Midwest Steel provided Hirschfeld with the goods, materials, equipment, and services described herein. Midwest Steel has not been paid. Midwest Steel provided all requisite notices under the foregoing bond and has complied with all terms and conditions of the bond.  Liberty Mutual, however, has failed to comply with the terms of the bond and has breached the terms of the bond. This breach has caused Midwest Steel to suffer damages of no less than $13,718,463.00, as is summarized above. Midwest Steel is entitled to recover at least $13,718,463.00 in damages in connection with its claims, plus all interest, costs, and attorneys' fees as allowed by law.

**V.**
**<u>INTEREST</u>**

     45.     Midwest Steel seeks pre and post-judgment interest at the maximum rate permitted by law.

14

# VI.
## ATTORNEY'S AND CONSULTANT'S FEES & EXPENSES

46.    Midwest Steel was forced to retain the law firms of Porter Hedges LLP and Beck & Hall P.C. to prosecute this action on its behalf and has agreed to pay the firms' reasonable and necessary attorneys' fees.

47.    Midwest Steel has also been forced to retain consultants, including Synergen, to aid in the prosecution of its claims.

48.    Midwest Steel is entitled to recover its reasonable consultants and attorneys' fees and costs under the governing contracts.

49.    This dispute involves claims by Midwest Steel against both Hirschfeld and CMHP. Article 14 of the sub-subcontract between Midwest Steel and Hirschfeld requires Midwest Steel to bring any claims that implicate both Hirschfeld and CMHP in accordance with the CMHP and Hirschfeld subcontract, and Article 16.5 states that Midwest Steel will have all of the benefits of the obligations and responsibilities that the USACE and CMHP assume towards Hirschfeld in the CMHP and Hirschfeld subcontract. Article 11.4 of the subcontract between CMHP and Hirschfeld states that the prevailing party in any legal action shall recover reasonable legal costs, including attorney's and consultant's fees, in connection with such action. Therefore, Midwest Steel has the benefit of this obligation and responsibility with respect to its claims made herein.

50.    Moreover, Article 15.4 of the sub-subcontract between Midwest Steel and Hirschfeld states that if either party employs an attorney to institute suit to enforce any of the provisions of the agreement, to protect its interest in any matter arising under the agreement, to collect damages for the breach of the agreement, or to recover on a surety bond given under the agreement, the prevailing party shall be entitled to recover reasonable attorney's fees, costs, charges, and expenses expended or incurred therein.

7671054v1

## VII.
## CONDITIONS PRECEDENT

51.      All conditions precedent to Midwest Steel's claims have occurred, have been performed by Midwest Steel, or have been waived.

## VIII.
## DEMAND FOR JURY TRIAL

52.      Midwest Steel asserts its rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## IX.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Midwest Steel prays that the defendants be cited to appear and file an answer herein, and that Midwest Steel have and recover judgment of and from the defendants for the following: (i) actual damages of no less than $13,718,463.00; (ii) pre- and post-judgment interest at the maximum legal rate; and (iii) its reasonable consultant and attorneys' fees, costs, court costs, and all other reasonable expenses incurred in connection with this proceeding, including additional attorneys' fees if an appeal occurs. Midwest Steel would also request that it be awarded such other and further relief to which it may show itself to be entitled.

Dated: May 7, 2019                    Respectfully submitted,

                                      **PORTER HEDGES LLP**

                                      By: /s/ David D. Peden

                                          **DAVID D. PEDEN**
                                          Texas Bar No. 15713500
                                          1000 Main Street, 36th Floor
                                          Houston, Texas  77002
                                          (713) 226-6610 telephone
                                          (713) 226-6210 facsimile
                                          dpeden@porterhedges.com

                                      **ATTORNEYS FOR PLAINTIFF**
                                      **UNITED STATES OF AMERICA**
                                      **for the use and benefit of MIDWEST**
                                      **STEEL, INC.**

                                      **E. LINK BECK**
                                      Texas Bar No. 02007400
                                      **BECK & HALL, P.C.**
                                      5915 Silver Springs Drive, Bldg. 4
                                      El Paso, Texas 79912
                                      (915) 544-5545 telephone
                                      (915) 544-1620 facsimile
                                      linkbeck@beckhallpc.com

                                      **ATTORNEYS FOR PLAINTIFF**
                                      **UNITED STATES OF AMERICA**
                                      **for the use and benefit of MIDWEST**
                                      **STEEL, INC.**

                                      **ALLISON J. SNYDER**
                                      Texas Bar No. 18813800
                                      **PORTER HEDGES LLP**
                                      1000 Main Street, 36th Floor
                                      Houston, Texas  77002
                                      (713) 226-6622 telephone
                                      (713) 226-6222 facsimile
                                      asnyder@porterhedges.com

                                      **ATTORNEY FOR PLAINTIFF**
                                      **UNITED STATES OF AMERICA**
                                      **for the use and benefit of MIDWEST**
                                      **STEEL, INC.**

7671054v1

**SEAN M. McCHRISTIAN**
Texas Bar No. 24067751
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas  77002
(713) 226-6632 telephone
(713) 226-6232 facsimile
smcchristian@porterhedges.com

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**
**for the use and benefit of MIDWEST**
**STEEL, INC.**

18

7671054v1